IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESESTER DUVA MCDAUGHTERY,<br><br>          Petitioner,<br><br>     v.<br><br>MATTHEW ATCHLEY,[1] Warden,<br><br>          Respondent. | Case No. CV 20-08488-RAO<br><br>MEMORANDUM OPINION AND ORDER |

On July 20, 2020, Petitioner Lesester Duva McDaughtery ("Petitioner") constructively filed the instant Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"). Dkt. No. 1. The parties have consented to proceed before a magistrate judge. Dkt. Nos. 2, 18-19. After reviewing the Petition, Answer, and Traverse, as well as the relevant lodged documents, the Court DENIES the Petition.

I.    **INTRODUCTION**

In 2018, a jury in the Los Angeles County Superior Court convicted Petitioner of two counts of criminal threats with the use of a deadly weapon and

---

[1] Petitioner is currently incarcerated at the Salinas Valley State Prison in Soledad, California. Matthew Atchley is the custodian at that prison and, accordingly, is substituted as the Respondent herein. *See* Fed.R.Civ.P. 25(d).

two counts of assault with a deadly weapon, one of which involved the infliction of great bodily injury. (1 Clerk's Transcript ("CT") at 191-96.) After Petitioner admitted having a prior strike under California's Three Strikes law, the trial court sentenced him to 24 years and four months in prison. (3 Reporter's Transcript ("RT") at 311-13; 1 CT at 244-48.)

Petitioner appealed to the California Court of Appeal, which affirmed the judgment in a reasoned decision.[2] (Lodg. Nos. 3-6.) Petitioner then filed a petition for review in the California Supreme Court, which was denied summarily. (Lodg. Nos. 7-8.)

On August 14, 2018, Petitioner's first habeas corpus petition filed in the Los Angeles County Superior Court was denied because his appeal was still pending. (Lodg. Nos. 9, 16 at 16.) On November 19, 2019, Petitioner filed a second habeas corpus petition in the Los Angeles County Superior Court that was denied both on the merits and for procedural deficiencies. (Lodg. Nos. 10, 11.) Thereafter, he filed a habeas petition in the California Court of Appeal, which was denied for "failing to state a prima facie case for relief." (Lodg. Nos. 12-13.) Finally, on March 23, 2020, Petitioner filed a writ of habeas corpus in the California Supreme Court, which was denied summarily on June 10, 2020. (Lodg. Nos. 14-15.)

On July 20, 2020, Petitioner, a California state prisoner proceeding pro se, constructively filed a Petition for Writ of Habeas Corpus by a Person in State Custody ("Petition"), pursuant to 28 U.S.C. § 2254, raising three grounds for relief.[3] (Docket No. 1.) On November 23, 2020, Respondent filed an Answer to

---

[2] The California Court of Appeal did remand the case to the trial court to exercise its discretion whether to strike an enhancement for a prior felony conviction. (Lodg. No. 6 at 11.) Ultimately, the trial court declined to strike the prior conviction and reaffirmed his sentence. (*See* Lodg. No. 16 at 24.)

[3] Pursuant to the prisoner "mailbox rule," the Court uses the date on which Petitioner submitted his petition to prison authorities for mailing as the filing date. *See Houston v. Lack*, 487 U.S. 266, 275-76 (1988). Under this rule, "the court deems the petition

2

the Petition and a supporting memorandum ("Answer"). (Docket No. 16.) Respondent also lodged the relevant state records. (Docket No. 17.) On January 4, 2021, Petitioner filed a Traverse. (Docket No. 23.)

## II. PETITIONER'S CLAIMS

The Petition raises three grounds for relief:

1. The prosecutor presented false evidence by allowing a witness to give perjured testimony that undermined Petitioner's defense at trial.

2. The prosecutor committed misconduct by failing to disclose surveillance videos that would have supported Petitioner's claim of self-defense.

3. The trial court was biased against him as evidenced by suppressing subpoenaed video records by the defense.

(Petition at 5-6, Attached Memorandum ("Attach. Memo. at 5-34.)

## III. FACTUAL SUMMARY

The Court adopts the factual summary set forth in the California Court of Appeal's opinion affirming Petitioner's conviction.[4]

*Prosecution Evidence*

On the evening of December 22, 2017, [Petitioner] was at the ground-floor apartment of his girlfriend, Victoria Williams. Williams' sister, Vanessa Conley, was also present. According to Williams, the three of them were drinking alcohol and ingesting cocaine; however, Conley denied that they were using drugs. At one point,

---

constructively 'filed' on the date it is signed." *Roberts v. Marshall*, 627 F.3d 768, 770 n.1 (9th Cir. 2010).

[4] The Court "presume[s] that the state court's findings of fact are correct unless [p]etitioner rebuts that presumption with clear and convincing evidence." *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008); 28 U.S.C. § 2254(e)(1). Because Petitioner has not rebutted the presumption with respect to the underlying events, the Court relies on the state court's recitation of the facts. *Tilcock*, 538 F.3d at 1141. To the extent that an evaluation of Petitioner's individual claims depends on an examination of the trial record, the Court herein has made an independent evaluation of the record specific to those claims.

3

[Petitioner] became "paranoid" and told the women to "get in the closet." He then turned off all the lights and went from room to room, looking out the windows. Conley, who had refused to get in the closet and said she did not like sitting in the dark, left the apartment. After she left, [Petitioner] moved the refrigerator so that it blocked the front door. He then accused Williams and Conley of setting him up to be attacked by gang members who were outside.

Williams was able to move the refrigerator, and Conley re-entered. [Petitioner] then moved the refrigerator back to block the door. When Conley went to turn on a kitchen light, [Petitioner] ordered her not to do so. She replied that she was not going to sit in the dark, whereupon [Petitioner] struck her in the head, breaking her glasses. He then pulled out a knife from the back of his pants and tried to stab Conley in the stomach. To protect herself, Conley grabbed the knife blade, and two fingers of her left hand were cut. Williams grabbed the knife handle, and the three of them struggled over the weapon.

Conley and Williams tried to push the refrigerator away from the door, but [Petitioner] prevented them. He called the women "bitches," accused them of "trying to set him up," and said he was going to kill them. [Petitioner] continued to thrust the knife towards the women.

Ultimately, the women were able to push the refrigerator from the door. Conley opened the front door a little bit and told Williams' neighbor, Gregory McCloud, who had come out of his apartment after being awakened by the sounds of the struggle, to call the police. [Petitioner] then dropped the knife and went outside.

Conley and Williams went to McCloud's apartment, and the police and paramedics soon arrived. Los Angeles Police Officer Vanessa Contreras, one of the responding officers, recovered the knife used in the assault from McCloud, and arrested [Petitioner], who was standing outside Williams' apartment and tried to walk away.

Conley later had surgery on her two injured fingers to repair severed tendons. At the time of trial, she could no longer bend the fingers.

According to Williams, [Petitioner] had numerous gang tattoos. Although he had lived with Williams for a time before the incident, he moved out after telling her that her apartment was in the area of a rival gang. [Petitioner] would usually leave Williams' apartment early, because he said that his life would be in danger if he was in the area after sundown. On the night of [Petitioner's] assault, there were no gang members or other people outside Williams' apartment.

*Defense Evidence*

[Petitioner] testified that on the evening of the incident, Williams invited him over because she had some cocaine. [Petitioner] was suspicious because it was getting dark and she had never before invited him over at night. While [Petitioner] was on the bus to Williams' apartment, Williams called a couple of times asking where he was, which made [Petitioner] more suspicious.

[Petitioner] arrived at the apartment around 7:00 p.m. Williams, Conley, and he were "partying and smoking crack and stuff" until about 12:30 a.m. Around that time, [Petitioner] noticed a "furtive movement" "on the patio," and Conley made the comment, "Look at him, he's hiding." Someone was jiggling the patio door, and Williams said, "Oh, they're working on the door." Through the blinds, [Petitioner] saw someone on the patio, and immediately thought "they're here to get me." Conley declared, "I've never been a part of anything like this before."

[Petitioner] retrieved a knife from the kitchen, and placed it in the back of his pants. He wanted to call the police but was unable to find his phone. He turned off the lights so that he would not be visible from the patio. He saw two people on the patio, one of whom was jiggling the door. He placed the refrigerator in front of the front door and began pacing back and forth. He had already checked the windows and doors to make sure they were locked, as was his habit whenever he went to Williams' apartment. Suddenly, he saw a "laser sight" come through a crack in the blinds. [Petitioner] heard someone say "[i]f you sight in, put the barrel against the glass." Conley then said "I hope they don't shoot me." She went to turn on a light and [Petitioner] pushed her away. When she resisted, [Petitioner] hit Conley in the face, saying "[m]an, you trying--you trying to get me killed in here."

Because someone was "really jiggling the door," [Petitioner] pulled the knife out, intending to run to the door, but Conley, apparently believing [Petitioner] was attacking her, grabbed the knife and they all started "tussling." [Petitioner] thought he would create a diversion by making the women scream to scare away the men on the patio, so he said "I'm gonna kill both you bitches," and pointed the blade towards Conley, making a conscious effort not to pull or push the knife because he did not want to injure Conley's hand. As he planned, the women began screaming, and the three of them continued to "tussle." [Petitioner] then saw the laser light moving around the inside of the apartment, and stooped up and down to avoid it. Eventually, [Petitioner] decided that the men on the patio had fled, so he let go of the knife, and allowed Williams and Conley to leave the apartment.

> [Petitioner] changed his bloody shirt, put on a burgundy hoodie, and stood outside the apartment. He did not want to go outside, believing he would be "a dead man," but he thought it was better to be arrested than killed. Nonetheless, when the police arrived, [Petitioner] walked away from them. He did not attempt to talk to them and did not tell them about the rival gang members trying to kill him.

(Lodg. No. 6 at 2-6.)

## IV. STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). In particular, this Court may grant habeas relief only if the state court adjudication was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court or was based upon an unreasonable determination of the facts. *Id.* at 100 (citing 28 U.S.C. § 2254(d)). "This is a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt[.]" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal citation and quotations omitted).

A state court's decision is "contrary to" clearly established federal law if: (1) the state court applies a rule that contradicts governing Supreme Court law; or (2) the state court confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court but nevertheless arrives at a result that is different from the Supreme Court precedent. *See Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000)). A state court need not cite or even be aware of the controlling Supreme Court cases "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

///

A state court's decision is based upon an "unreasonable application" of clearly established federal law if it applies the correct governing Supreme Court law but unreasonably applies it to the facts of the prisoner's case. *Williams*, 529 U.S. at 412-13. A federal court may not grant habeas relief "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be *unreasonable*." *Id.* at 411 (emphasis added).

In determining whether a state court decision was based on an "unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2), such a decision is not unreasonable "merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The "unreasonable determination of the facts" standard may be met where: (1) the state court's findings of fact "were not supported by substantial evidence in the state court record"; or (2) the fact-finding process was deficient in some material way. *Hibbler v. Benedetti*, 693 F.3d 1140, 1146 (9th Cir. 2012) (citing *Taylor v. Maddox*, 366 F.3d 992, 999-1001 (9th Cir. 2004)).

In applying these standards, a federal habeas court looks to the "last reasoned decision" from a lower state court to determine the rationale for the state courts' denial of the claim. *See Cannedy v. Adams*, 706 F.3d 1148, 1156 (9th Cir. 2013) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). There is a presumption that a claim that has been silently denied by a state court was "adjudicated on the merits" within the meaning of 28 U.S.C. § 2254(d), and that AEDPA's deferential standard of review therefore applies, in the absence of any indication or state-law procedural principle to the contrary. *See Johnson v. Williams*, 568 U.S. 289, 298 (2013) (citing *Richter*, 562 U.S. at 99).

Here, Petitioner raised the claims in the instant Petition in the state courts on collateral review. (*See* Lodg. Nos. 12, 14.) The California Court of Appeal rejected Petitioner's claims for "failing to state a prima facie case for relief," and

the California Supreme Court subsequently denied them without comment or citation.  (Lodg. Nos. 13, 15.)  Accordingly, under the "look through" doctrine, Petitioner's claims are deemed to have been rejected on the merits by the California Court of Appeal.  *See Phelps v. Alameida*, 569 F.3d 1120, 1125 n.8 (9th Cir. 2009) (holding state court's rejection of claim for failure to state a prima facie case constitutes denial on the merits).

Because the state appellate court did not explain its rationale for concluding that Petitioner had not established a prima facie case for relief, the Court will conduct an independent review of the record to determine whether the decision was objectively reasonable.  *See Godoy v. Spearman*, 834 F.3d 1078, 1084 (9th Cir. 2016) ("[W]e doubt the denial of [petitioner's] habeas petition can properly be considered a reasoned decision, since it states only that [petitioner] had 'fail[ed] to state a prima facie case for relief.'"), *rev'd on other grounds*, 861 F.3d 956 (2017); *see also Murray v. Schriro*, 745 F.3d 984, 1010 (9th Cir. 2014) (finding superior court's decision rejecting ineffective assistance of counsel claim that "merely concluded that [petitioner] 'fail[ed] to raise a colorable issue of ineffective assistance of counsel'" was not a reasoned decision).  In doing so, the Court will uphold the state court's decision so long as there is any reasonable basis in the record to support it.  *See Richter*, 562 U.S. at 102 (holding that reviewing court "must determine what arguments or theories supported or[ ] . . . could have supported[ ] the state court's decision" and "whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with" Supreme Court precedent).  Although the Court independently reviews the record, it must "still defer to the state court's ultimate decision."  *Libberton v. Ryan*, 583 F.3d 1147, 1161 (9th Cir. 2009) (internal quotations and citation omitted).[5]

---

[5]  Even under a de novo standard, the result would be the same, as Petitioner has failed to demonstrate a violation of his constitutional rights.  *See Berghuis v. Tompkins*, 560 U.S. 370, 390 (2010) ("Courts can, however, deny writs of habeas

8

## V. DISCUSSION

### A. Ground One: False Evidence

In Ground One, Petitioner claims that the prosecutor committed misconduct by presenting perjured testimony when Vanessa Conley testified that she had surgery on her hand two weeks after she was assaulted by Petitioner with a knife. (Petition, Attach. Memo. at 5-14.) Petitioner contends that the prosecutor "knew there had been no surgery" because there were no medical records to substantiate the surgery and Conley had not mentioned the surgery during the preliminary hearing. (*Id.*) He argues that this "false evidence" was prejudicial because it allowed the jury to find that he committed great bodily injury on Conley during the attack. (*Id.* at 15-23.)

#### 1. *Background*

The preliminary hearing took place on January 11, 2018. (1 CT at 7.) Vanessa Conley testified that Petitioner tried to "stick" the knife in her side, so she "start[ed] holding on to it with [her] left hand" to prevent getting stabbed. (*Id.* at 60, 62.) She testified that the cuts from knife caused her to be unable to bend her pinkie and ring finger. (*Id.* at 60-61.) She told the court, "I have to have surgery." (*Id.*) She also described how the paramedics treated her wounds on the night of the assault but stated that she did not go to the emergency room or see a doctor because she did not have insurance. (*Id.* at 61.)

Two months later, on March 26, 2018, Conley testified at Petitioner's trial. (3 RT at 321.) She again testified that she grabbed onto the blade of the knife "[t]o keep [Petitioner] from pushing it in [her] stomach or [her] side." (*Id.* at 327, 331.) She testified that two of her fingers were "paralyzed" from being cut by the knife, and the jury was shown a photograph of her injuries. (*Id.* at 328.) Petitioner, who

---

corpus under § 2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review.").

9

was representing himself at trial, objected on foundational grounds because there were "no medical reports" to substantiate the claims. (*Id.*) The Court overruled the objection. (*Id.*) She went on to tell the jury that the tendons in her fingers had been "severed," which required her "to have surgery." (*Id.* at 329.) She testified the surgery "didn't work too well" and she was currently going through physical therapy. (*Id.*) Petitioner again objected because the prosecution "hadn't produced any medical records." (*Id.* at 330.) Again, it was overruled. (*Id.*) Conley testified that she had the surgery "[a]bout two weeks" after the attack. (*Id.* at 330-31.)

On cross-examination, Petitioner asked Conley when and where she had the surgery on her fingers. Conley told him it was about two weeks after the incident at Kaiser Permanente in Sacramento. (*Id.* at 347.) The following colloquy then occurred:

> [Petitioner]: Well, ma'am, three weeks after the incident you were here in preliminary hearing, ma'am.
>
> [Conley]: Yeah. I came back.
>
> [Petitioner]: Oh, you left and came back?
>
> [Conley]: Yes, I did.
>
> [Petitioner]: And you hadn't had surgery then, ma'am?
>
> [Conley]: Yes, I did.
>
> [Petitioner]: No. You demonstrated for the court. Ma'am, do you have any medical records concerning that particular surgery.
>
> [Conley]: No. I didn't bring them with me.
>
> [Petitioner]: So, it's your testimony that you left and flew to Sacramento, had surgery, and came back and testified at preliminary hearing.
>
> [Conley]: Yes.

(*Id.* at 348.) Conley told Petitioner she flew on Southwest Airlines but did not remember the exact day of the flight or have a record of it. (*Id.* at 348-49.) Petitioner then asserted that, at the preliminary hearing, Conley did not testify that

she had already been to the doctor in Sacramento. (*Id.* at 350-51.) Conley responded that she "could have been off a day or two," that she did not recall the "exact date" of the surgery, but that she could get medical records to prove that she was being truthful. (*Id.* at 351.)

### 2. *Federal Law and Analysis*

Prosecutors must "refrain from improper methods calculated to produce a wrongful conviction." *Berger v. United States*, 295 U.S. 78, 88 (1935). The appropriate standard of review for prosecutorial misconduct is the narrow one of due process and not the broad exercise of supervisory power. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Accordingly, a defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." *Id.* at 183 (internal quotations omitted); *see also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

In order to prevail on a prosecutorial misconduct claim premised on the alleged presentation of false evidence, Petitioner must establish that his conviction was obtained by the use of false evidence that the prosecutor knew at the time to be false or later discovered to be false and allowed to go uncorrected. *See Napue v. Illinois*, 360 U.S. 264, 269 (1959). In order to state a claim under *Napue*, Petitioner must show that the testimony was actually false, that the prosecutor knew or should have known that it was false, and that the falsehood was material to the case. *Jones v. Ryan*, 691 F.3d 1093, 1102 (9th Cir. 2012); *Jackson v. Brown*, 513 F.3d 1057, 1071-72 (9th Cir. 2008). A *Napue* violation is material if there is any reasonable likelihood that the false testimony could have affected the jury's decision. *Libberton*, 583 F.3d at 1164.

Here, Petitioner has not shown that Vanessa Conley's testimony regarding the injuries to her hand or the medical treatment she sought was false. First, the

prosecution was not required to produce Conley's medical records to corroborate her testimony or demonstrate that she suffered great bodily injury. *See Chilcote v. Sherman*, 2018 WL 3584460, at *6 (S.D. Cal. Jul. 26, 2018) (noting that "medical records of hospitalization and treatment are not required to show great bodily injury" and finding that victim testimony and photographic evidence was sufficient); *Carreon v. Long*, 2014 WL 1093074, at *18 (C.D. Cal. Feb. 7, 2014) (holding that the testimony of the victim and the nurse who treated the victim was "itself evidence of [the victim's] injuries regardless of any medical records").

Second, Petitioner's accusation that Conley lied about having surgery on her hand is speculative. He relies on contradictory testimony from the preliminary hearing—in which she said she had not seen a doctor—and later at trial—where she said that she had surgery on the hand before she testified at the preliminary hearing. Though these two statements are facially contradictory, "inconsistencies in testimony are insufficient to establish that a witness intentionally gave false testimony." *See United States v. Zuno-Arce*, 44 F.3d 1420, 1423 (9th Cir. 1995) (as amended) ("Discrepancies in testimony . . . could as easily flow from errors in recollection as from lies."); *see also United States v. Croft*, 124 F.3d 1109, 1119 (9th Cir. 1997) (holding that actual falsity was not shown where witness merely had "conflicting recollections of events"). Petitioner offers no other evidence suggesting that Conley's testimony about surgery was false.

Furthermore, Petitioner extensively cross-examined Conley regarding the details and timing of her surgery. (3 RT at 347-51.) Conley admitted that she might have been incorrect on the timeline of events, though she was steadfast on her claim that she had surgery on her hand because of the injuries she sustained from the knife attack. (*Id.* at 351.) Conley's account of her surgery was corroborated by her sister, Victoria Williams, who testified that Conley did not receive medical treatment in Los Angles but had surgery on her hand in Sacramento. (2 RT at 134.) Where a witness is "cross-examined . . . thoroughly

and well on the discrepancies in [her] recollections, . . . the determination of credibility is for the jury." *Zuno-Arce*, 44 F.3d at 1423; *see also United States v. Geston*, 299 F.3d 1130, 1135 (9th Cir. 2002) (holding that, when "two conflicting versions" were presented, it is "within the province of the jury to resolve the disputed testimony"). Petitioner offers no evidence, other than his unsupported assertions, that the testimony was false or that the prosecutor knew Conley's testimony was false and allowed it "to go uncorrected." *See Napue*, 360 U.S. at 269.

For these reasons, the California Court of Appeal's rejection of this prosecutorial misconduct for the presentation of false evidence claim was not an unreasonable application of, or contrary to, clearly established law from the United States Supreme Court.

### B. Ground Two: *Brady* Violation

In Ground Two, Petitioner claims that the prosecutor committed misconduct by failing turn over surveillance videos of the patio outside of Williams' apartment on the night of the assault. (Petition, Attach. Memo. at 29-31.) He argues that the videos would have shown that there were "attackers" outside the apartment in support of his self-defense claim. (*Id.* at 29-30.)

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." To constitute a *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).

///

Evidence is material "only if there is a reasonable probability that had the evidence been disclosed the result at trial would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). There is a "reasonable probability" of prejudice when the suppression of evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995); *see also Killian v. Poole*, 282 F.3d 1204, 1210 (9th Cir. 2002) ("If exculpatory or impeachment evidence is not disclosed by the prosecution and prejudice ensues, a defendant is deprived of due process. Prejudice is determined by looking at the cumulative effect of the withheld evidence and asking whether the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (internal quotation marks and citations omitted)).

Here, Petitioner offers no evidence that the police were ever in possession of any videos showing the outside patio area on the night in question. The government has no obligation to turn over materials not in its possession. *See United States v. Bracy*, 67 F.3d 1421, 1429 n.5 (9th Cir. 1995) (holding that the prosecution does not have a duty to volunteer information to the defense that is not in its possession); *United States v. Chen*, 754 F.2d 817, 824 (9th Cir. 1985) ("While the prosecution must disclose any [*Brady*] information within the possession or control of law enforcement personnel, . . . it has no duty to volunteer information that it does not possess or of which it is unaware.").

Petitioner argues that he has "personal knowledge" that there was a security surveillance system that monitored the area. (Traverse at 16.) He suggests that the police had a "duty" to collect the evidence from these cameras and turn them over in discovery to Petitioner. (*Id.* at 16-17.) Even if that were true, Petitioner presents no evidence that the videos captured images of any "attackers" that night. Absent that evidence, his *Brady* claim is completely speculative and must be rejected. *See Runningeagle v. Ryan*, 686 F.3d 758, 769 (9th Cir. 2012) ("[T]o state a *Brady* claim, [a petitioner] is required to do more than 'merely speculate' about" the

14

nature of undisclosed evidence.); *United States v. Lopez-Alvarez*, 970 F.2d 583, 598 (9th Cir. 1992) (rejecting *Brady* claim when defendant's assertion that allegedly withheld evidence existed was "purely speculative"). Nor has Petitioner demonstrated how evidence of unknown attackers outside the apartment would have aided his claim of self-defense and changed the outcome of the trial when he assaulted two women inside the apartment. As such, any video evidence was simply not material. *Bagley*, 473 U.S. at 682.

For these reasons, the California Court of Appeal's rejection of this prosecutorial misconduct claim was not contrary to, or an unreasonable application of clearly established federal law. Accordingly, Petitioner's claim in Ground Two must be rejected.[6]

### C. Ground Three: Judicial Bias

In Ground Three, Petitioner claims that the judge in his trial was biased against him. (Petition at 6.) He argues that the judge "suppressed . . . subpoenaed evidence" by failing to give Petitioner the surveillance videos from Williams' apartment complex on the night of the assault. (Petition, Attach. Memo. at 31-34.)

#### 1. *Background*

Prior to trial, Petitioner's investigator sent a subpoena duces tecum to the Broadway Villa Marina Apartments, seeking a copy of the video surveillance recordings in December 2017 and asking that it be sent to the trial court. (*See*

---

[6] Petitioner argues that he is entitled to discovery in this habeas proceeding to obtain the alleged video evidence. (Petition, Attach. Memo. at 30-32.) "A habeas petitioner 'is not entitled to discovery as a matter of ordinary course.'" *Smith v. Mahoney*, 611 F.3d 978, 996 (9th Cir. 2010) (quoting *Bracy v. Gramley*, 520 U.S. 899, 904 (1997)). Rather, a habeas petitioner is entitled to discovery only upon a fact-specific showing of good cause and in the court's exercise of discretion. *See Bracy*, 520 U.S. at 904. Good cause exists "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Harris v. Nelson*, 394 U.S. 286, 300 (1969). Petitioner has not met that burden and, therefore, his motion for discovery is DENIED.

Lodg. No. 12 at 36-37.) Before the start of trial, Petitioner inquired as to the "results of [his] subpoenas." (2 RT at 10.) He told the court that he had served two subpoenas: one on the LAPD for calls regarding gang activity in the area and another on the management company of the apartment complex for surveillance videos. (*Id.*). The court stated that there was a return envelope from the LAPD but that the response indicated that they were "unable to locate requested records." (*Id.* at 10-11.) The court did not indicate that there was any returned documents or other items from the management company, and Petitioner did not inquire further about the subpoena. (*Id.* at 11.) Shortly thereafter, Petitioner indicated that he was ready for trial and had no other issues to discuss with the court. (*Id.* at 12-13.)

After trial, Petitioner wrote a letter to the trial court asking about the subpoenaed surveillance video tapes. (*See* Lodg. No. 16 at 16.) The court indicated that it was "not in receipt of discovery items requested in a subpoena from Broadway Villa" apartments and did not have a copy of any served subpoena. (*Id.*)

### 2. *Federal Law and Analysis*

The right to a fair trial is a basic requirement of due process and includes the right to an unbiased judge. *Haupt v. Dillard*, 17 F.3d 285, 287 (9th Cir. 1994) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)); *see also Paradis v. Arave*, 20 F.3d 950, 958 (9th Cir. 1994) ("[D]efendants are entitled to a judge who has no direct personal interest in the outcome of a proceeding."). To succeed on a judicial bias claim, however, a petitioner must "overcome a presumption of honesty and integrity in those serving as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975). Furthermore, judicial rulings alone "almost never" demonstrate judicial bias. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also Larson v. Palmateer*, 515 F.3d 1057, 1067 (9th Cir. 2008) ("[N]either adverse rulings nor impatient remarks are generally sufficient to overcome the presumption of judicial integrity.").

///

Petitioner provides no evidence that the trial court "suppressed" any surveillance video evidence to the detriment of Petitioner. In fact, the record indicates that the court did not have a copy of a served subpoena on the apartment management company, let alone any documents or videos from the company in response to the subpoena. As such, Petitioner's claim of judicial bias is completely speculative and lacks merit. *See Martinez v. Ryan*, 926 F.3d 1215, 1227 (9th Cir. 2019) ("At bottom, [petitioner's] judicial bias claim is based on unfounded speculation."); *Valle v. Gonzalez*, 2015 WL 4776944, at *15 (C.D. Cal. Jul. 2, 2015) ("Petitioner's speculative assertions do not rise to the level needed to overcome the *Withrow* presumption and to demonstrate judicial bias.").

Accordingly, the California Court of Appeal's rejection of Ground Three was neither contrary to, nor an objectively unreasonable application of, any clearly established federal law, and Petitioner is not entitled to habeas relief on this claim.

## VI. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that the Petition is DENIED, and Judgment shall be entered dismissing this action with prejudice.

DATED: March 5, 2021

ROZELLA A. OLIVER
UNITED STATES MAGISTRATE JUDGE

17